**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DIVISION OF MISSISSIPPI**
**EASTERN DIVISION**

**MARGARET STARR**                                                  **PLAINTIFF**

**v.**                                    **CIVIL ACTION NO.: 2:20-CV-113-TBM-MTP**

**MARION COUNTY; BERKLEY HALL,**
*in his official capacity as Sheriff of Marion*
*County*; **MATT BROWN,** *in his individual*
*capacity and official capacity as a Marion*
*County Sheriff Deputy*; **JOHN DOE OFFICERS**
**1-10,** *in their individual capacity and official*
*capacity as a Marion County Sheriff Deputies*          **DEFENDANTS**

<u>**MEMORANDUM OPINION GRANTING IN PART AND**</u>
<u>**DENYING IN PART MOTION FOR SUMMARY JUDGMENT**</u>

On June 8, 2017, Plaintiff Margaret Starr alleges that she tore her meniscus after she was tackled while being arrested by Deputy Matt Brown of the Marion County Sheriff's Department. She filed suit, pursuant to 42 U.S.C. § 1983, claiming false imprisonment and excessive force in violation of the Fourth and Fourteenth Amendments. On July 26, 2021, the Defendants filed a Motion for Summary Judgment [28] based on qualified immunity. In her Response [31], Starr conceded all false imprisonment claims, as well as any claim against Defendant Marion County. [31], pg. 2. The only remaining claim is Starr's excessive force claim against Defendant Matt Brown.

Even though Deputy Brown argues that qualified immunity entitles him to summary judgment based on Starr's version of events alone, several material factual questions remain foreclosing judgment at this stage. Viewing the facts in the light most favorable to Starr, a reasonable jury could find that Deputy Brown engaged in unconstitutional excessive force against

her. Moreover, case law recognizes a violation of a clearly established constitutional right at the time of the incident. Thus, for the reasons explained, the Motion for Summary Judgment [28] is denied with regard to the excessive force claim.

## I. FACTUAL BACKGROUND

Starr presented the following facts in her deposition [31-2] and her subsequent sworn declaration [31-1]. On June 8, 2017, a young woman called 911 and claimed that she was being held against her will by her boyfriend—Starr's son—at Starr's home. [31-2], pg. 33. Starr claims that she was unaware of any alleged domestic violence or kidnapping occurring at her home. *Id.* at 24-25. Instead, while she was cooking, she heard a voice commanding everyone in the house to step outside. *Id.* at 25. Starr stuck her head out of the door and observed deputies from the Marion County Sheriff's Office surrounding her home, brandishing weapons. *Id.* at 26. Despite the command to exit, Starr initially shut the door "because there's a bunch of wasps that swarm around the door and [she] didn't want them inside." *Id.* Then, she complied and exited the home. The deputies told her to stand by her car, and Starr did so. *Id.* Starr answered the deputies' questions about who else was in the home, and where they were located. *Id.* Starr then gave the deputies permission to search her home. *Id.* at 26-27.

The deputies entered and arrested her son. *Id.* at 27. The deputies also discovered the young woman, who was covered in bruises, and the woman's five-year-old child in the back bedroom. [28-2], pp. 1-3. They brought Starr's son to the same spot in the yard where they previously told Starr to stand, so Starr moved under the shadier carport. [31-2], pg. 27. She continued to ask the officers what was happening. *Id.* Then, according to Starr, one unnamed deputy—not Defendant Matt Brown—came out of the house and headbutted Starr's son. *Id.* Starr

protested, and the same deputy allegedly turned toward her and stated, "[O]h, so you think it's okay for somebody to beat—him to beat—your son to beat a woman like that?" *Id.* Afraid, Starr backed up and tripped, falling over backwards in the carport. *Id.* at 28. Meanwhile, the deputies put her son into a patrol car. [31-1], pg. 1.

Between thirty to forty-five minutes passed, and numerous deputies remained at the home. *Id.* Still, according to Starr, none of them would answer Starr's questions. [31-2], pg. 30. Starr "looked around" and "didn't see anybody," so she decided to go back inside the home to get her phone to contact an attorney. *Id.* Inside, Starr alleges she heard someone say, "shoot her." *Id.*

Starr immediately exited onto the back porch. *Id.* She claims that without warning, a deputy grabbed her arm and pulled it behind her back. [31-1], pg. 2. Starr claims she had a torn rotator cuff at this time and would have been wearing a sling had she not taken it off to cook. [31-2], pp. 30-31. Thus, the grabbing of her arm caused her pain. *Id.* at 31. She grabbed her wrist with her free hand to stop the deputy from pulling it. *Id.* She also attempted to explain her rotator cuff injury, and that she was only holding a cell phone. *Id.* However, another deputy, Defendant Matt Brown, allegedly tackled Starr. [31-1], pg. 2. They fell down her porch steps, and Starr's knee landed on top of a metal grate in the carport. *Id.* Starr claims that none of the deputies informed her that she was being arrested before she was tackled. *Id.*

As a result of the tackling, Starr alleges that she suffered a torn meniscus in her left knee. *Id.*, [31-2], pg. 38. Due to the pain, Starr had to quit her job. [31-2], pp. 40-41. She later had to undergo surgery on that knee. *Id.* at 40. She also alleges that she suffers from severe anxiety and distress. [31-1], pg. 3.

Deputy Brown's version of events varies considerably. In his sworn affidavit, Deputy Brown states that the Marion County SWAT team was dispatched to Starr's home in response to a possible kidnapping. [28-2], pg. 1. When the deputies arrived, they encountered Starr, who "appeared to be non-compliant with commands to move away from the residence and towards the officers." *Id.* After she did not comply with the deputies' instructions to come to their vehicles, Deputy Brown claims that "[s]everal members of the SWAT team took Ms. Starr into custody." *Id.* at 3. It is unclear what the phrase "into custody" meant at this point, because Deputy Brown explains that when he exited Starr's home later, other deputies were "still dealing with Ms. Starr." *Id.* Deputy Brown and other officers entered the home and discovered Starr's son, a visibly injured young woman, and a five-year-old child. *Id.* According to Deputy Brown, the young woman began to cry and hug him, and she repeatedly thanked the deputies for saving her. *Id.* Meanwhile, outside, Starr was still "being very uncooperative." *Id.* Starr was "finally" taken "into custody with force." *Id.* Deputy Brown's affidavit does not elaborate on the "force" used, nor explain why she was placed "into custody" a second time. Deputy Brown does attest, however, that he "had very little contact with Starr and at no time did [he] use force on her." *Id.* at 1. Despite the stark factual disparities between Deputy Brown and Starr's recollection of events, Deputy Brown argues in his motion that he is entitled to summary judgment based on the facts as alleged by Starr alone. [28], pg. 7.

Once in custody, Starr was transported to the Marion Walthall Correctional Facility. [28-2], pg. 3. Her son was indicted for two counts of kidnapping and one count of aggravated assault domestic violence. [28-5], pp. 1-2. Starr was indicted as an accessory after the fact and for hindering

apprehension or prosecution. *Id.* at 2.[1] Starr's charges were later dismissed on August 8, 2018. [28-6], pg. 1.

## II. PROCEDURAL HISTORY

Starr filed her suit in the Circuit Court of Marion County, Mississippi. The Defendants removed the action to this Court based on federal question jurisdiction on June 6, 2020. [1]. The Defendants filed the instant Motion for Summary Judgment [28] on July 26, 2021. A hearing on the motion was held on September 1, 2021.

## III. STANDARD OF REVIEW

Summary judgment is warranted when the evidence reveals no genuine dispute regarding any material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P 56(a). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The trial court must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment. *Casey Enterprises, Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981) (citations omitted). The substantive law identifies which facts are material. *Liberty Lobby*, 477 U.S. at 248. Thus, despite the great factual distinctions between Starr and Deputy Brown's version of events, the Court must resolve factual questions in

---

[1] Starr requested in her Response that the indictment [28-5], along with the Marion County Sheriff's Office investigative report [28-4], be stricken from the record as incompetent summary judgment evidence. Starr argues that the indictment is irrelevant. However, one of the factors that the Court must examine when determining the reasonableness of Deputy Brown's use of force is the severity of the crime for which Starr was suspected. *See infra* Part IV, Section A, Subsection 1. Therefore, the text of the indictment is necessary to evaluate the nature of the crime for which she was accused on the day that Deputy Brown allegedly tackled her. Starr's request to strike the indictment [28-5] is denied. Moreover, because the Court did not rely on the Marion County Sheriff's Office investigative report to arrive at this decision, Starr's request to strike exhibit [28-4] is denied as moot.

Starr's favor at this stage. *See Doss v. Helpenstell*, 626 F. App'x 453, 456-57 (5th Cir. 2015) (accepting plaintiff's version of events surrounding an alleged incident of excessive force despite a very different version of facts presented by the defendant in a motion for summary judgment based on qualified immunity).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The nonmoving party must then "go beyond the pleadings" and "set forth 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324 (citation omitted).

Notably, the normal "summary judgment burden of proof is altered in the case of a qualified immunity defense." *Wolfe v. Meziere*, 566 F. App'x 353, 354 (5th Cir. 2014) (citing *Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005); *Bazan ex rel. Bazan v. Hidalgo Cnty*, 246 F.3d 481, 489 (5th Cir. 2001)). Indeed, the burden shifts to the plaintiff to show that the defense is not available. *Orr v. Copeland*, 844 F.3d 484, 490 (5th Cir. 2016) (quoting *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016)). A plaintiff "must rebut the defense by establishing that the officer's allegedly wrongful conduct violated clearly established law." *Wolfe*, 566 F. App'x at 354 (citing *Michalik*, 422 F.3d at 262; *Bazan ex rel. Bazan*, 246 F.3d at 489). The plaintiff "cannot rest on conclusory allegations and assertions but must demonstrate genuine issues of material fact regarding the reasonableness of the officer's conduct." *Id*. But even when evaluating a qualified immunity defense, "all inferences are still drawn in the plaintiff's favor" at the summary judgment

stage. *Tucker v. City of Shreveport*, 998 F.3d 165, 173 (5th Cir. 2021) (citing *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010)).

## IV. DISCUSSION

Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985). The privilege is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell*, 472 U.S. at 511. Courts use a two-step analysis to determine whether a defendant is entitled to qualified immunity. The Court must decide "(1) whether the facts that the plaintiff has alleged make out a violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct." *Ramirez v. Martinez*, 716 F.3d 369, 375 (5th Cir. 2013) (quoting *Brown v. Strain*, 663 F.3d 245, 249 (5th Cir. 2011)). Courts have discretion to address either prong of the qualified immunity inquiry first. *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009). "[U]nder either prong, [the Court] may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Winzer v. Kaufman County*, 916 F.3d 464 (5th Cir. 2019) (citing *Tolan v. Cotton*, 572 U.S. 650, 134 S. Ct. 1861, 1866, 188 L. Ed. 2d 895 (2014)). Instead, the Court "must view the evidence in the light most favorable to the opposing party." *Tolan*, 134 S. Ct. at 1866 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970)).

Starr does not argue that the Defendants violated her constitutional rights by allegedly causing her to trip, threatening to shoot her, or twisting her arm and aggravating her previously torn rotator cuff. Instead, she complains only that Deputy Matt Brown violated the Fourth and

Fourteenth Amendment's prohibition of excessive force when he allegedly tackled her. The Court will first determine whether, based on the facts alleged, Starr has demonstrated that Deputy Brown violated her constitutional rights. If so, the Court will then determine whether the constitutional right Deputy Brown allegedly violated was clearly established as of June 8, 2017.

## A. Constitutional Violation

The Fourth Amendment guarantees the right of citizens to be secure from "unreasonable" seizures, including seizures through excessive force. *Graham v. Connor*, 490 U.S. 386, 394-95, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). This right has been incorporated against the states through the Fourteenth Amendment. *See Brothers v. Zoss*, 837 F.3d 513, 518 (5th Cir. 2016). To demonstrate excessive force during an arrest, Starr must prove "that she suffered (1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable." *Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir. 2004) (citing *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000)). Here, the issue raised is whether the force used was unreasonable. At this summary judgment stage, Deputy Brown does not take issue with prongs one and two.

To determine whether force was reasonable under the Fourth Amendment, "the overarching question is 'whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them.'" *Trammell v. Fruge*, 868 F.3d 332, 340 (5th Cir. 2017) (quoting *Graham*, 490 U.S. at 397). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Rockwell v. Brown*, 664 F.3d 985, 991 (5th Cir. 2011) (quoting *Graham*, 490 U.S. at 396). Factors to be considered include: "(1) the severity of the crime at issue, (2) whether the

suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (internal quotations omitted) (quoting *Graham*, 490 U.S. at 396). This test "is not capable of precise definition or mechanical application." *Graham*, 490 U.S. at 396 (quoting *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S. Ct. 1861, 1884, 60 L. Ed. 2d 447 (1979)).

### 1. Severity of the Crime

Turning first to the severity of the crime, Starr was indicted as an accessory after the fact to her son's alleged kidnapping. The maximum punishment for this felony is twenty years in prison. MISS. CODE § 97-1-5. She was also indicted for allegedly hindering apprehension, which can be punished with up to a fifteen-year sentence. MISS. CODE § 97-9-129. These are both serious offenses. And, even though the charges were later dismissed, "[t]he Fifth Circuit does not require that an actual crime be committed for this factor to weigh in favor of the defendant; suspicion of a crime is enough." *Polkinghorn v. Liles*, No. CV H-17-3470, 2018 WL 2722323, at *5 (S.D. Tex. June 6, 2018).

However, this factor is not particularly illuminating to the facts of the case at bar. The alleged tackle took place *after* her son was in custody. A factual question remains as to exactly how long the use of force occurred after Starr's son was already safely placed in one of the deputies' cruisers—but according to Starr it was at least thirty to forty-five minutes later. Thus, when Deputy Brown allegedly tackled her, Starr could not have been "conceal[ing]" her son from them or obstructing his arrest by "force, deception, or intimidation" as the indictment charges. [28-5], pg. 2. Further, in Starr's version of events she committed no crime—which potentially militates against weighing this factor in favor of the Defendants on summary judgment. *See Newman v.*

*Guedry*, 703 F.3d 757, 762 (5th Cir. 2012) (analyzing the severity of the crime factor and recognizing the plaintiff presented evidence of a factual question as to whether the plaintiff actually committed a crime at all). And, at the time of being tackled,—at least according to Starr's description of events—she was not committing a crime of violence posing imminent risk of harm to others, which this first *Graham* factor is often concerned with. *See Parker v. Gerrish*, 547 F.3d 1, 9 (1st Cir. 2008) ("Though driving while intoxicated is a serious offense, it does not present a risk of danger to the arresting officer that is presented when an officer confronts a suspect engaged in an offense like robbery or assault."). Interpreting the facts in the light most favorable to Starr, this factor does not support Deputy Brown's use of force.

## 2. Threat to Safety

The second *Graham* factor analyzes whether Starr posed an immediate threat to law enforcement or others. The facts at this stage are similarly insufficient to weigh this factor in favor of Deputy Brown. Deputy Brown has offered no evidence of any circumstances perceived by him that caused him to believe a threat existed. In fact, at this stage, the record contains no evidence of what Deputy Brown observed at all before he allegedly used force on Starr—because he denies tackling her altogether. Meanwhile, Starr's version of the moments leading up to the tackle does not show a genuine threat. She claims that she exited the house onto the porch, carrying only her cell phone. She was explaining to the deputies that the object in her hand was only a phone when Deputy Brown tackled her.

Thus, on her version of events, Deputy Brown had no reason to believe that Starr was, for example, carrying a deadly weapon or threatening the deputies. *Cf. Polkinghorn*, 2018 WL 2722323, at *5 (finding no excessive force when officer "took [the plaintiff] to the ground" after the plaintiff

threatened to beat the officer and possessed what the officer believed was a knife). Further, Starr is a grandmother standing five feet and five inches tall. *See Brown v. Long Beach Police Dep't*, 105 F. App'x 549, 550 (5th Cir. 2004) (affirming denial of motion to dismiss when a fleeing teenage girl weighing less than one hundred pounds was tackled by an officer weighing three hundred pounds). Starr did grab her own wrist to prevent a deputy from pulling her arm behind her back. But the record does not fully explain the nature of Starr's resistance when she "grabbed [her] own wrist" and said "wait, wait, wait, stop, stop, stop." [31-2], pg. 31. Thus, at this stage the Court does not yet know, for instance, whether she successfully used her free hand to pull the other arm from the deputy's grip. But, even had she pulled her arm from the deputy, "'[p]ulling [one's] arm out of [an officer's] grasp, without more, is insufficient to [establish] an immediate threat to the safety of the officer[ ]' for purposes of the *Graham* factors." *Tucker v. City of Shreveport*, 998 F.3d 165, 178 (5th Cir. 2021) (alterations in original) (quoting *Ramirez v. Martinez*, 716 F.3d 369, 378 (5th Cir. 2013)) And again, there is no evidence that Deputy Brown even saw her grabbing her wrist or saw her pulling her arm away before he allegedly tackled her. Without any evidence of what Deputy Brown perceived relating to the threat posed by Starr, and mindful that the facts must be viewed in the light most favorable to the Plaintiff, this factor does not support Deputy Brown's alleged use of force.

### 3. Active Resistance or Flight

Finally, the third *Graham* factor considers whether Starr was actively resisting or attempting to flee arrest. Deputy Brown presents four moments from Starr's deposition testimony as evidence of resistance justifying Deputy Brown's use of force. The first three instances are alleged failures to comply with the deputies' commands. Only the fourth instance—Starr grabbing

her arm to prevent a deputy from pulling it behind her back—can be categorized as physical resistance.

Examining the first three instances of alleged noncompliant behavior, "Officers may consider a suspect's refusal to comply with instructions . . . in assessing whether physical force is needed," though they "must assess not only the need for force, but also 'the relationship between the need and the amount of force used.'" *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (quoting *Gomez v. Chandler*, 163 F.3d 921, 923 (5th Cir. 1999)). Noncompliance is resistance, but it is a form of *passive* resistance, not *active* resistance. *Becker v. Elfreich*, 821 F.3d 920, 927 (7th Cir. 2016) (internal quotations and alterations omitted) ("Willful non-compliance is not the same as actively resisting but instead a passive resistance requiring the minimal use of force.").

"[W]here an individual's conduct amounts to mere 'passive resistance,' use of force is not justified." *Trammell v. Fruge*, 868 F.3d 332, 341 (5th Cir. 2017). *But see Robles v. Ciarletta*, 797 F. App'x 821, 827-28 (5th Cir. 2019) (interpreting *Trammell* in the context of the *Graham* factors to find that passive resistance alone does not *per se* preclude the use of physical force, but does limit the amount of force that can be reasonably applied). The general rule is that noncompliance does not permit the use of physical force unless the individual's passive resistance poses some sort of threat.[2]

---

[2] *See Brown v. City of Golden Valley*, 574 F.3d 491, 497 (8th Cir. 2009) (affirming denial of summary judgment when an officer tased the plaintiff after she disobeyed two commands to hang up her phone because a genuine issue of fact existed as to whether her behavior was a realistic threat to the officer's safety); *Becker*, 821 F.3d at 923-28 (affirming denial of qualified immunity when an officer held his knee on the plaintiff's back and allowed his dog to bite the plaintiff's leg after the plaintiff failed to obey his command to get on the ground, even though the plaintiff did not exhibit aggressive behavior and held his hands in full view in the air); *Est. of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 896-906 (4th Cir. 2016) (finding excessive force when officers tased a mentally ill plaintiff who refused to comply with their orders to let go of a stop sign because he demonstrated little risk to the officers); *Smoak v. Hall*, 345 F. App'x 134, 140-41 (6th Cir. 2009) (finding use of force "clearly unreasonable" when officer "drove [the plaintiff] to the ground" and injured his knee after the plaintiff stood up despite being ordered to kneel because the plaintiff had been compliant until that point, was already handcuffed, and two officers were already holding

This discussion assumes that Starr was indeed noncompliant with the deputies' commands on June 8, 2017. A closer look, however, at what Starr actually testified to reveals that genuine factual questions remain as to whether she was noncompliant at all. In fact, Starr avers that she "followed every command given" to her by the deputies. [31-1], pg. 2. Moreover, the Court also notes that even if the first two of the incidences of "noncompliance" identified by the Defendants did constitute "resistance," they occurred at least thirty minutes before Deputy Brown tackled Starr according to her testimony. Thus, the first two alleged instances of noncompliance by Starr have little bearing on the legitimacy of Deputy Brown's use of force.

With these principles in mind, the Court now examines in detail the instances of Starr's alleged noncompliance leading up to the tackle. The first act of disobedience occurred, according to Deputy Brown, when the deputies commanded everyone in Starr's home to exit. Upon hearing their voices outside, Starr opened the front door and peered out. Deputy Brown notes that Starr did not immediately exit, instead choosing to shut her front door to allegedly prevent wasps from getting inside. But Starr's testimony goes on to demonstrate that she *did* exit the home immediately after. And when she did, Starr answered all the deputies' questions and gave them permission to enter her home. At most, this creates a factual issue as to whether Starr's actions at this point were noncompliant. Furthermore, this act did not pose a risk to Deputy Brown or any other deputy over half an hour later when he allegedly tackled her.

---

him). *C.f. Draper v. Reynolds*, 369 F.3d 1270, 1277-83 (11th Cir. 2004) (finding no excessive force when an officer tased the plaintiff after the plaintiff ignored the officer's repeated verbal commands because the plaintiff's noncompliance was hostile, belligerent, laced with profanity, and "would likely have[] escalated . . . into a serious physical struggle in which either [party] would be seriously hurt").

Next, Deputy Brown focuses on Starr's movements around the scene. He argues that Starr defied the deputies' instructions by leaving the spot in the yard where the deputies told her to stand. But factual questions remain as to whether her movement from the yard to the carport should be considered resistance. For instance, the record is unclear as to how much time elapsed before Starr, as she explained, decided to escape the sun and move under the shade of the carport. [31-2], pg. 27. Moreover, her testimony was that she only moved when the deputies brought her handcuffed son to the same location that they had told her to stand. *Id.* And nowhere in Starr's deposition does she testify that any of the deputies present at this point reprimanded her or asked her not to move. It is thus unclear whether this movement by Starr should be described as noncompliant behavior. Nor has Deputy Brown explained how her movement to the carport presented a threat thirty to forty-five minutes later when he tackled her on the porch.

Deputy Brown argues that Starr's third act of disobedience occurred when she left the carport and entered the home. Starr claimed that she went inside to get her phone and call a lawyer because none of the deputies at the scene would answer her questions about what was happening. She waited thirty to forty-five minutes before she did go inside, however, and once inside, her testimony was that she simply grabbed her phone and sat on her recliner. [31-1], pg. 1; [31-2], pg. 30. Her son had already been placed inside of one of the deputies' vehicles at this point. [31-1], pg. 1. Starr further noted that she left the home as soon as she realized that the deputies were displeased that she was inside (and, allegedly, someone mentioned shooting her). Like the other moments identified by Deputy Brown, factual questions remain as to whether this act constituted resistance, and what danger it posed.

14

Having dealt with Starr's alleged noncompliance to commands, the Court must now examine her physical resistance—the moment when Starr grabbed her wrist to pause a deputy from handcuffing her arms behind her back. Starr claims that she did so because the deputy handcuffing her was hurting her torn rotator cuff. Nevertheless, she was resisting. The question, though, is whether grabbing her wrist to prevent the deputy from pulling her arm constituted passive resistance, or whether it was active resistance justifying Deputy Brown's use of force.

The Fifth Circuit has noted that "[i]t is unclear at what point passive resistance becomes the sort of active resistance which justifies force." *Trammell*, 868 F.3d 332 at 341. But the *Trammell* court found that a reasonable jury could conclude that merely pulling one's arm away from an arresting police officer did not justify tackling a plaintiff. *Id. See also Goodson*, 202 F.3d at 740 ("A fact issue therefore exists as to the objective reasonableness of the force used" when the plaintiff was tackled after pulling his hand away from an arresting officer when the plaintiff was not fleeing and there was no reasonable suspicion to detain or frisk the plaintiff); *Ramirez*, 716 F.3d at 378 (finding an officer's use of taser "objectively unreasonable under the *Graham* factors" when "according to [the plaintiff] the only resistance he offered was pulling his arm out of [the officer's] grasp"). Here, a factual question exists as to the extent of Starr's resistance and whether it justified Deputy Brown allegedly tackling her.

Moreover, factual questions remain regarding how quickly Deputy Brown allegedly resorted to force after Starr grabbed her wrist. Law enforcement officers must respond to "rapidly evolving, volatile situation[s]" with "measured and ascending responses." *See Galvan v. City of San Antonio*, 435 F. App'x 309, 311 (5th Cir. 2010). The Fifth Circuit has repeatedly noted that "the speed with which an officer resorts to force is relevant in determining whether that force was

excessive to the need." *Trammell*, 868 F. 3d at 342 (finding that a reasonable jury could find excessive force when only three seconds elapsed between the officer's request to the plaintiff to put his hands behind his back and the officer tackling him); *Newman*, 703 F.3d at 763 (denying summary judgment when officers immediately resorted to using a taser and nightstick on the plaintiff without attempting to negotiate with him); *Deville*, 567 F.3d at 168 (holding that a reasonable jury could find excessive force when an officer quickly resorted to breaking the plaintiff's window and dragging her out of the vehicle rather than attempting to negotiate with her). Here, under her version of events, Starr was never told that she was under arrest. Instead, just as she exited her home an unidentified deputy grabbed her right arm and pulled it back. [31-2], pg. 30. She then grabbed her wrist and attempted to explain her torn rotator cuff when Deputy Brown tackled her without warning. Accepting the facts presented by her as true, a jury could reasonably find that Deputy Brown's sudden resort to a tackle—without any attempt to give further commands to Starr, negotiate with her, or even wait to let her explain herself—is excessive force in violation of the Fourth Amendment.

One of the problems afflicting Deputy Brown at this juncture is Deputy Brown's complete denial of tackling or even having much interaction with Starr. At the summary judgment stage, the Court is bound to accept the Plaintiff's version of events as true. Conversely, allegations of excessive force "are analyzed for 'objective reasonableness,' viewed from the on-scene perspective of a reasonable officer 'often forced to make split second judgments . . . about the amount of force that is necessary in a particular situation' without the benefit of hindsight." *Galvan*, 435 F. App'x at 310-11 (quoting *Graham*, 490 U.S. at 396-97). But here there is no evidence from Deputy Brown's perspective explaining why he believed that Starr posed a threat, how he

perceived her resistance, or why he could not negotiate with her before allegedly tackling her. And evidence of the officer's perception of events can be vital to the Court's qualified immunity analysis.[3]

To be sure, it appears Deputy Brown's defense is that Starr was not tackled at all. That is a jury question upon which Deputy Brown may ultimately prevail. But at summary judgment, the Court must interpret the facts in the light most favorable to Starr—meaning the Court must assume that Deputy Brown indeed tackled her. And the Court has only been presented with Starr's perception and observations in the moments leading to the tackling, not Deputy Brown's. The Court does not know what Deputy Brown saw before allegedly resorting to force. It is impossible to determine, for instance, whether Deputy Brown perceived something from Starr's behavior that would give a reasonable officer license to tackle her, or whether he tackled her in anger from the alleged kidnapping and abuse by her son. Of course, an officer's subjective "evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force." *Graham*, 490 U.S. at 397. But there is an insufficient record to determine whether the force used was objectively reasonable as a matter of law.

---

[3] *See Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005) (emphasis added) ("[T]he reasonableness of an officer's actions is determined *based on the information possessed by the officer at the moment that force is employed*."); *Henderson v. Munn*, 439 F.3d 497, 503 (8th Cir. 2006) (emphasis added) (quoting *Cross v. City of Des Moines*, 965 F.2d 629, 632 (8th Cir. 1992) ("[T]he party moving for summary judgment, 'must demonstrate that no material issues of fact remain as to whether the defendant's actions were objectively reasonable in light of the law and *the information the defendant possessed at the time of his actions.*'"); *Aponte Matos v. Toledo Davila*, 135 F.3d 182, 186 (1st Cir. 1998) (alterations in original) (emphasis added) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S. Ct. 3034, 3040, 97 L. Ed. 2d 523 (1987) ("Qualified immunity protects . . . state officials from liability for damages in a civil rights action if 'a reasonable officer could have believed [his actions] to be lawful, in light of clearly established law and *the information the [acting] officer[ ] possessed.*'"); *Wells for Chambers v. Talton*, 695 F. App'x 439, 444 (11th Cir. 2017) (emphasis added) (quoting *Stewart v. Baldwin Cnty. Bd. of Educ.*, 908 F.2d 1499, 1504 (11th Cir. 1990) ("[A] police officer is entitled to qualified immunity 'if a reasonable police officer could have believed his or her actions were lawful in light of clearly established law *and the information possessed by the officer.*'").

Thus, based on the evidence presented by Starr and the lack of evidence relating to the information that Deputy Brown possessed, summary judgment is inappropriate at this stage. On these facts a reasonable jury could find that Deputy Brown violated Starr's Fourth Amendment rights when he allegedly tackled her down the porch stairs. The Court must now determine whether this action violated a right clearly established at the time Deputy Brown allegedly tackled Starr.

## B. Clearly Established Right

A right is "clearly established" when "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640. "If officers of reasonable competence could disagree as to whether the plaintiff's rights were violated, the officer's qualified immunity remains intact." *Tarver v. City of Edna*, 410 F.3d 745, 750 (5th Cir. 2005). "[T]here need not be a case directly on point, but 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Tucker*, 998 F.3d at 173-74 (quoting *White v. Pauly*, ––– U.S. ––––, 137 S. Ct. 548, 551, 196 L. Ed. 2d 463 (2017)). "The central concept is that of 'fair warning': The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'" *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (en banc) (quoting *Hope v. Pelzer*, 536 U.S. 730, 740, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002)).

"'[I]n an obvious case,' the *Graham* excessive-force factors themselves 'can "clearly establish" the answer, even without a body of relevant case law.'" *Newman*, 703 F.3d at 764 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)). In less obvious cases, "reasonableness is

judged against the backdrop of the law at the time of the conduct." *Brosseau*, 543 U.S. at 198. "Clearly established law is determined by controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Clarkston v. White*, 943 F.3d 988, 993 (5th Cir. 2019), *cert. denied*, 140 S. Ct. 2763, 206 L. Ed. 2d 937 (2020) (quoting *Delaughter v. Woodall*, 909 F.3d 130, 139 (5th Cir. 2018)).

Case law demonstrates that Deputy Brown's alleged actions violated a clearly established right. The facts of this case are most closely analogous to *Goodson v. City of Corpus Christi*, 202 F.3d 730 (5th Cir. 2000), where the Fifth Circuit reversed a district court's grant of qualified immunity. There, two officers stopped a plaintiff whom they believed matched the description of a person wanted for assault. *Id.* at 733. The facts after that were heavily disputed. The plaintiff claimed that the officers told him to place his hands on the officer's vehicle, but grabbed his arm before the plaintiff could comply. *Id.* at 734. Surprised, the plaintiff pulled his arm away from the officers. *Id.* Both police officers tackled him, breaking his shoulder. *Id.* Due to the factual distinctions between the plaintiff's and defendants' stories, the Fifth Circuit reversed the grant of summary judgment and qualified immunity. *Id.* at 740.

Thus, seventeen years prior to the events of this case, the Fifth Circuit has clearly established that tackling a person who merely pulled her hands away from an officer constitutes excessive force. This determination is bolstered by the Fifth Circuit's finding in *Trammell v. Fruge*, 868 F.3d 332 (5th Cir. 2017), decided only two months after the events of the case at hand.[4] Facing

---

[4] In citing *Trammell*, the Court does not suggest that *Trammell* created clearly established law for this decision. For qualified immunity purposes, cases decided after the conduct in question cannot give fair notice to government officials and "are of no use in the clearly established inquiry." *Brosseau*, 534 U.S. at 200 n.4. Instead, as the Tenth Circuit has explained:

> In citing [the circuit court's] later decisions, we do not suggest that a reasonable officer would not have known the conduct here was unconstitutional without their benefit. Rather, we merely note

very similar facts, the court concluded that "*Goodson* gave officers 'fair warning'" that tackling a plaintiff "after very minimal physical resistance—pulling away from an officer after the officer grabbed the plaintiff's arm[—]" was unconstitutional. *Id.* at 343.

Courts have distinguished *Goodson* by stating that "[d]riving [*Goodson*'s excessive force] analysis, however, were the court's conclusions that material issues remained as to whether the officers had reasonable suspicion to detain Goodson or probable cause to arrest him." *Poole*, 691 F.3d at 632. Yet, in *Trammell*, the Fifth Circuit explained that the *Goodson* officers' lack of probable cause went to the first *Graham* factor—the severity of the crime. *Trammell*, 868 F.3d at 343. Therefore, because the defendants in *Goodson* did not reasonably suspect the plaintiff of a crime, the first *Graham* factor weighed against them. *See Goodson,* 202 F.3d at 740. Likewise, here, material factual questions remain preventing the first factor from being weighed in the Defendants' favor. As explained in *supra* Part IV, Section A, Subsection 1, a genuine dispute remains regarding the proximity in time between Starr's alleged crime and the use of force, whether her alleged crime was violent in nature, or even whether she committed any crime at all. Thus, the "severity" of her crime is very much in the air. *Goodson* provided the Defendants with fair warning, at the very least, that tackling people—who are not reasonably suspected of severe crimes (at least under the first *Graham* factor) and whose resistance only consists of pulling their arm away—is an unconstitutional use of force.

---

that our clearly established law analysis here is in line with circuit precedent which (1) involves similar conduct . . . , that (2) occurred in the same relevant period . . . , and (3) relies on the same cases . . . for clearly established law.

*McCoy v. Meyers*, 887 F.3d 1034, 1053 n.24 (10th Cir. 2018). *Goodson* was sufficient to provide Deputy Brown notice that his alleged behavior was unconstitutional. *Trammell* simply demonstrates that this Court's qualified immunity analysis is in line with the Fifth Circuit's analysis at a similar time of similar conduct based on *Goodson*.

A "a robust consensus of persuasive authority" existing before June 8, 2017, also gave Deputy Brown fair notice that his alleged behavior violated a constitutional right. *Clarkston*, 943 F.3d at 993. *See Smith v. Ray*, 781 F.3d 95, 98-103 (4th Cir. 2015) (affirming denial of summary judgment in favor of a defendant officer when he threw to the ground a plaintiff—suspected of, at most, a nonviolent misdemeanor—after she pulled her arm away from him twice and used a racial slur); *McCaig v. Raber*, 515 F. App'x 551, 553-56 (6th Cir. 2013) (affirming denial of summary judgment in favor of defendant officer who "slamm[ed]" to the ground a plaintiff that the officer was arresting for battery when the plaintiff jerked his hand away from the officer's attempt to put him in handcuffs); *Blankenhorn v. City of Orange*, 485 F.3d 463, 478-79 (9th Cir. 2007) (reversing summary judgment in favor of defendant officers who "gang tackled" a plaintiff suspected of trespass when his resistance was limited to pulling free of one officer's grasp, using expletives, throwing his driver's license on the ground, and refusing to kneel down); *Rowland v. Perry*, 41 F.3d 167, 172-74 (4th Cir. 1994) (affirming denial of summary judgment in favor of defendant officer who punched a plaintiff suspected of stealing five dollars, threw him to the ground, and used a "wrestling maneuver" to break his leg when the plaintiff "instinctively tried to free himself" after the officer grabbed the plaintiff's collar and jerked him without warning). These cases plainly establish that law enforcement officers use unconstitutional excessive force when they violently take citizens to the ground who are suspected of non-severe crimes and who offer minimal resistance—such as pulling an arm away.

Deputy Brown cites *Poole v. City of Shreveport*, 691 F.3d 624 (5th Cir. 2012) to support his contention that his actions, even on Starr's version of events, did not violate clearly established law. But that case is distinguishable. In *Poole*, an officer pulled over the plaintiff after the plaintiff—

21

in a fit of road rage—threw a cup out of his truck and onto an off-duty officer's vehicle. *Id.* at 625. The on-duty officer, with the off-duty officer present, performed a field sobriety test on the plaintiff, during which time the plaintiff claimed that the off-duty officer threatened him. *Id.* The plaintiff raised both of his hands at the off-duty officer and told the officer to hit him. *Id.* The officers asked the plaintiff to turn around and attempted to put his arms behind his back, but the plaintiff backed away instead. *Id.* at 626. The off-duty officer then grabbed the plaintiff by the left arm, and the on-duty officer attempted to grab his other arm. *Id.* In response, the plaintiff "tucked [his right arm] into his chest and verbally and physically resisted [the officer's] repeated stern commands for [the plaintiff] to give it to him." *Id.* The on-duty officer then tased the plaintiff, causing them to lose control of the plaintiff, who dislocated his shoulder. *Id.* The Fifth Circuit concluded that "the force the officers used in arresting him was not objectively excessive or clearly unreasonable." *Id.* at 629.

However, the significant factual differences between *Poole* and the case at bar belie the Defendant's reliance on it. The deputies' interactions with Starr here began with far less hostility than the interaction in *Poole*. In fact, Starr initially complied with the deputies and gave them permission to search her home. The plaintiff in *Poole* arguably made a physical threat toward the officers with his hands, and no evidence has been presented that Starr made any threatening gestures. The officers in *Poole* made repeated commands to the plaintiff, which the plaintiff "verbally and physically" rebuffed. *Id.* at 626. Defendants argue that Starr likewise flaunted repeated commands by the deputies before Deputy Brown tackled her. But these alleged failures of Starr to comply—if indeed they could be categorized as such—occurred over a long period of time. Starr's "resistance" was not the "immediate and persistent" resistance posing an

22

"immediate threat to the safety of the officers" that the *Poole* court found conclusive. *Id.* at 629 (quoting *Deville*, 567 F.3d at 167). Nor did Deputy Brown—as Starr testified—give or repeat any verbal commands or attempt to give a "measured and ascending" response to Starr before tackling her. *Id.*

Two other, more recent cases are also distinguishable. In *Robles v. Ciarletta*, 797 F. App'x 821, 824 (5th Cir. 2019), a police officer grabbed a plaintiff suspected of assault by the arm and took him to the ground. This was after the plaintiff refused to turn around, and despite the officer commanding him to do so six times in the span of ten seconds. *Id.* Additionally, the officer believed that the plaintiff was armed with a knife, and the plaintiff had taken a step toward the officer while exclaiming, "Don't be hollering at me." *Id.* at 824, 827. The court assumed, *arguendo*, that the plaintiff alleged a violation of his Fourth Amendment rights, but found that the officer's actions did not violate clearly established precedent. *Id.* at 826-28. The severity of the crime suspected, the repeated, immediate failures to comply, and the threat posed by the potentially armed and angry suspect all readily distinguish *Robles* from the facts of the case at hand.

In *Tucker v. City of Shreveport*, 998 F.3d 165 (5th Cir. 2021) officers stopped the plaintiff for a traffic violation in a "high crime area." *Id.* at 178-81. Rather than quickly pulling his vehicle over, however, the plaintiff drove for several more minutes until pulling into a residential driveway— which the officers perceived as "a red flag, because you don't know if somebody's . . . going to come out of the house on top of you-all or what the deal is, or if they called people." *Id.* at 178-79. After approaching the officers' vehicle, the plaintiff "repeatedly bang[ed] his fist on the vehicle, [waived] his pointed finger in the air, and vigorously clapp[ed] his hands several times" all while flailing his arms about in an "erratic, unpredictable manner" and unleashing a "verbal tirade"

against the officers. *Id.* When one officer began pulling the plaintiff's arm to handcuff him, the officer felt the plaintiff tensing up and make a "slight arm movement." *Id.* That officer performed a "takedown" maneuver on the plaintiff in response. *Id.* at 180. The court, also considering the plaintiff's height advantage over the officers, determined that the officer's conduct did not violate clearly established law. *Id.* at 180-81. Yet while the plaintiff's "slight arm movement" in *Tucker* was arguably an even lesser movement than Starr's movement here, *Tucker* does not prevent denial of qualified immunity in the case at hand. No evidence thus far has been presented that Starr created a "tense, uncertain, and rapidly evolving" situation by acting with "extreme and increasing anger and agitation" immediately prior to the tackling. *Id.* at 179-80. Nor did this grandmother's size or physical prowess present the officers with the same threat as did the plaintiff in *Tucker*. *Id.*

Considering the facts in the light most favorable to her, the conduct alleged by Starr violated the clearly established law of the Fifth Circuit as of June 8, 2017. In light of the Fifth Circuit's decision in *Goodson*, along with a robust consensus of circuit decisions, no reasonably competent law enforcement officer could disagree that Deputy Brown's alleged actions—tackling Starr down her porch steps after she grabbed her own wrist to prevent a deputy from pulling it back—violated the Fourth Amendment.

## V. CONCLUSION

Genuine disputes of material fact exist foreclosing summary judgment in favor of Deputy Brown. The facts alleged by Starr amount to an unconstitutional violation of the Fourth Amendment. Further, the conduct that Starr accuses Deputy Brown of violated clearly established federal law.

IT IS THEREFORE ORDERED AND ADJUDGED, for the reasons stated above, that the Defendants' Motion for Summary Judgment [28] based on qualified immunity is GRANTED in part, and that Starr's claims regarding unlawful arrest and false imprisonment, as well as any claim against Defendant Marion County, are DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that the Defendants' Motion for Summary Judgment [28] based on qualified immunity is DENIED in part, regarding Starr's claim of excessive force against Deputy Brown.

IT IS FURTHER ORDERED that Starr's request to strike Exhibits [28-4] and [28-5] is DENIED.

THIS, the 23rd day of November, 2021.

TAYLOR B. McNEEL
UNITED STATES DISTRICT JUDGE